## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

## BLUEFIELD DIVISION

**DEBORAH LYNN MURPHY,**

     **Plaintiff,**

**vs.**                        **CIVIL ACTION NO. 1:16-CV-11518**

**NANCY A. BERRYHILL,[1]**
**ACTING COMMISSIONER OF**
**SOCIAL SECURITY,**

     **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Acting Commissioner of Social Security denying the Plaintiff's applications for Disability Insurance Benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. By Order entered December 2, 2016 (Document No. 4.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Brief in Support of Complaint and Defendant's Brief in Support of Defendant's Decision. (Document Nos. 20 and 23.)

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **GRANT** Plaintiff's request to reverse the Commissioner's final decision *only* with respect to the period prior to the established

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for Acting Commissioner Carolyn W. Colvin as the Defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

onset date of disability, November 28, 2013 (Document No. 20.), **DENY** Defendant's request to affirm the decision of the Commissioner (Document No. 23.); **REVERSE** the final decision of the Commissioner **only** with respect to the period prior to the established onset date of disability, November 28, 2013; and **REMAND** this action for further proceedings.

<u>**Procedural History**</u>

The Plaintiff, Deborah Lynn Murphy (hereinafter referred to as "Claimant"), protectively filed her application for Title II benefits on January 11, 2013, alleging disability since February 18, 2010, because of "asthma, migraines, and fibromyalgia".[2] (Tr. at 164.) Her claim was initially denied on September 19, 2013 (Tr. at 82-86.) and again upon reconsideration on December 20, 2013. (Tr. at 88-90.) Thereafter, Claimant filed a written request for hearing on January 9, 2014. (Tr. at 95-96.) An administrative hearing was held on July 21, 2015 before the Honorable Anne V. Sprague, Administrative Law Judge ("ALJ"). (Tr. at 31-57.) On October 15, 2015, the ALJ entered a partially favorable decision finding Claimant had been under a disability since November 28, 2013. (Tr. at 10-30.) On November 4, 2015, Claimant sought review by the Appeals Council of the ALJ's decision. (Tr. at 7-8.) The ALJ's decision became the final decision of the Commissioner on November 8, 2016 when the Appeals Council denied Claimant's Request. (Tr. at 1-6.)

On November 30, 2016, Claimant timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 2.) The

---

[2] In her Disability Report – Appeal, submitted on October 15, 2013, Claimant alleged that she experienced "severe hip and leg pain coming from a birth defect in hip bone alignment" which resulted in nerve damage. (Tr. at 191.) In a subsequent Disability Report – Appeal, submitted on January 8, 2014, Claimant alleged that her pain was worse, as well as the frequency of her asthma attacks, and that her "hips hurt so ba[d] it makes it difficult to sleep" and they hurt when sitting. (Tr. at 210.)

Commissioner filed an Answer and a Transcript of the Administrative Proceedings. (Document Nos. 10 and 11.) Subsequently, Claimant filed a Brief in Support of Complaint (Document No. 20.), in response, the Commissioner filed a Brief in Support of Defendant's Decision. (Document No. 23.), and Claimant filed her Response to the Commissioner's Brief. (Document No. 24.) Consequently, this matter is fully briefed and ready for resolution.

## Claimant's Background

Claimant was 51 years old as of the alleged onset date, considered a "person closely approaching advanced age", and then transitioned into considered a "person of advanced age" as of November 28, 2013. See 20 C.F.R. § 404.1563(d) and (e). (Tr. at 23, 24.) Claimant has a high school education and subsequently completed specialized training as a secretary. (Tr. at 165.) Claimant last worked on February 18, 2010 working as a cashier in a small retail store; she had numerous jobs in the last fifteen years, primarily in retail working as a cashier, as a clerk, or in customer service. (Tr. at 164, 165.)

## Standard

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. § 404.1520. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. § 404.1520(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. § 404.1520(b). If the claimant

is not, the second inquiry is whether claimant suffers from a severe impairment. Id. § 404.1520(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. § 404.1520(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. § 404.1520(f). By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. Id. § 404.1520(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

**Summary of ALJ's Decision**

In this particular case, the ALJ determined that Claimant met the requirements for insured worker status through September 30, 2014. (Tr. at 16, Finding No. 1.) Moreover, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since the alleged onset date. (Id., Finding No. 2.) Under the second inquiry, the ALJ found that Claimant had the following severe impairments: asthma/chronic obstructive pulmonary disease (COPD); osteoarthritis; chronic cervical and dorsolumbar strain; and IgGE subclass 2 and 3 deficiency. (Id., Finding No. 3.) At the third inquiry, the ALJ concluded since the alleged onset date of February 18, 2010, Claimant's impairments did not meet or equal the level

of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 17, Finding No. 4.) The ALJ then found that since February 18, 2010, Claimant had the residual functional capacity ("RFC") to perform a range of light work:

> She can lift and carry no more than 20 pounds occasionally and 10 pounds frequently; stand and walk no more than 6 hours in an 8-hour workday; sit no more than 6 hours in an 8-hour workday; occasionally balance, stoop, kneel, crouch, crawl, and climb ramps, stairs, ladders, ropes, or scaffolds; should avoid concentrated exposure to unprotected heights, dangerous equipment, extreme heat and cold, vibrations, dust, chemicals, and fumes; and should avoid being around large groups of people.

(Id., Finding No. 5.)

At step four, the ALJ found Claimant was unable to perform any past relevant work since the alleged onset date of February 18, 2010. (Tr. at 23, Finding No. 6.) The ALJ next found that prior to her established disability onset date, Claimant was an "individual closely approaching advanced age", but on November 28, 2013, she transitioned into "an individual of advanced age." (Id., Finding No. 7.) The ALJ determined that Claimant had at least a high school education and able to communicate in English. (Id., Finding No. 8.) Prior to November 28, 2013, the ALJ found that the transferability of job skills was immaterial, and the Medical Vocational Rules supported a finding that Claimant was not disabled. (Tr. at 24, Finding No. 9.) At the final step, the ALJ found that prior to November 28, 2013, in addition to the immateriality of the transferability of job skills, Claimant's age, education, work experience, and RFC indicated that there were jobs that existed in significant numbers in the national economy that Claimant could have performed. (Id., Finding No. 10.) However, beginning on November 28, 2013, the date Claimant's age category changed, the ALJ determined Claimant was disabled, but not prior to November 28, 2013. (Tr. at 25, Finding Nos. 11 and 12.)

**Claimant's Challenges to the Commissioner's Decision**

Claimant asserts that the ALJ erred in finding her capable of substantial gainful employment at the light and/or sedentary exertional levels prior to November 28, 2013 because she failed to appreciate the fact that Claimant only had substantial gainful activity in 2006 from 2000 through 2014, when she was frequently ill and missing work as a result. (Document No. 20 at 3-5.) Claimant did not get diagnosed with a genetic immune deficiency until 2014 which was the cause of her problems during the relevant period. (Id. at 4.)

Claimant also argues that the ALJ's evaluation of the opinion evidence made no sense and that it was "obvious that she believed it unnecessary because she had already determined that the Plaintiff 'grid[d]ed out' on November 28, 2013." (Id. at 6-7.) Specifically, Claimant contends that the ALJ gave significant weight to the State agency medical opinions, both of whom found Claimant had no severe impairment, but were also not privy to the critical evidence[3] documenting Claimant's immunology disorder, nevertheless, their opinions conflicted with the ALJ's own finding that Claimant had severe impairments. (Id. at 7-8.) Moreover, Claimant argues that the ALJ gave less weight to the opinions provided by Claimant's treating sources, all of which were more consistent with one another as opposed to the non-examining State agency opinions, and that some of the limitations found by these treating sources were adopted by the ALJ in formulating the RFC. (Id. at 8-10.) These inconsistencies highlight the ALJ's failure to abide by the Regulations in evaluating opinion evidence. (Id.)

Additionally, Claimant states that the ALJ never mentioned Claimant's excessive absenteeism as her primary impediment to employment, due to her frequent illnesses and

---

[3] Fraley v. Astrue, 2:10-cv-00762, 2011 WL 2681647 (S.D.W.Va. July 11, 2011) (ALJ erred in relying upon State agency consultant's opinion who did not have the benefit of key medical evidence).

prolonged recovery periods; the vocational expert testified that such absenteeism would preclude employment. (Id. at 10.) Claimant also takes issue with the ALJ's credibility analysis because it underscored the ALJ's failure to appreciate Claimant's immune disorder impairment; Claimant did not have to seek emergency room care or other specialized care for her illnesses, but it took her longer because of her impairment to get over her illnesses. (Id. at 10-11.) Finally, the ALJ's finding that Claimant did not even think she was disabled denigrated her credibility misconstrues her testimony; Claimant simply did not know she could file for benefits for being sick and missing work. (Id. at 11-12.)

In sum, Claimant requests the Court to find that she was disabled as of February 18, 2010 because the substantial evidence of record supports such a finding. (Id. at 12.)

In response, the Commissioner argues that pursuant to Grid Rule 202.06, Claimant's age, education, and work experience directed a finding of "disabled" as of November 28, 2013, however, prior to that date, Claimant did not prove that she had any functional limitations precluding substantial gainful activity. (Document No. 23 at 10-11.) The Commissioner further asserts that the ALJ properly evaluated Claimant's treating source opinions, as the Regulations provide that functional determinations are within her sole discretion, as well as RFC assessments. (Id. at 11-12.) Moreover, the ALJ appropriately accommodated Claimant's limitations as noted by her treating sources in her RFC, and the opinions expressed few conclusions regarding Claimant's functional ability; importantly, Claimant does not identify any inconsistencies between these opinions and the RFC. (Id. at 12-13.) The ALJ's not giving more weight to these opinions is also harmless because she incorporated the limitations they found in the RFC. (Id. at 13.) Moreover, Claimant does not demonstrate how this harmed her. (Id. at 14.)

The Commissioner argues that the ALJ was justified in giving Ms. Hill-Hurt's opinion limited weight because it infringed upon the Commissioner's exclusive duty to determine Claimant's disability, and not entitled to any special deference. (Id.) Moreover, the Commissioner contends that the ALJ considered the factors promulgated under the Regulations with respect to her evaluation of the opinion evidence, nevertheless, the Regulations do not require an express discussion of each factor. (Id. at 15.) Finally, the ALJ's evaluation of the State agency medical opinion evidence was supported by substantial evidence because the opinions were supported by the record, and those medical consultants are experts in evaluating disability claims. (Id.) Claimant's disagreement with the ALJ's assessment of the conflicting evidence does not render her assessments erroneous, and further, the Court is not permitted to reweigh conflicting evidence to arrive at a different conclusion. (Id. at 15-16.)

The Commissioner also argues that the hypothetical questions posed to the vocational expert need only include those limitations supported by the record, and in this case, the ALJ fairly accounted for Claimant's credibly established limitations in her hypotheticals. (Id. at 16-17.) The Commissioner asserts that the record did not show that Claimant would have been absent from work as she alleged, and that her medical treatment during that period was conservative, and did not demonstrate that she had major problems that would have precluded employment. (Id. at 17.) In sum, Claimant's impairments were not severe enough to support a finding that they caused her significant functional limitations, therefore, the RFC assessment is supported by substantial evidence. (Id. at 18.)

Finally, with respect to the ALJ's credibility analysis, the Commissioner argues that the ALJ properly performed the two-step process, and further, found that Claimant's alleged disabling

conditions were not supported by the objective medical evidence, and further, the treatment records during the relevant period were unremarkable. (Id. at 18-19.) Claimant did not quit smoking despite her providers advising her to quit, which also undermined her credibility. (Id. at 19-20.) The Commissioner also points out that the ALJ took note of Claimant's material contradictory statements regarding her disability and that further, Claimant's immune disorder is genetic, and she managed to work for a number of years despite this impairment, however, the diagnosis alone does not render her disabled without proof of functional deficits. (Id. at 20.)

The Commissioner asks the Court to affirm the decision. (Id.)

In reply, Claimant explains that her impairment would not necessitate emergency room visits or require more than conservative care, her genetic impairment renders her more susceptible to contracting infections and illness and that her recovery time is prolonged; the frequent and prolonged illness is what makes her disabled, not the illness or infections themselves. (Document No. 24 at 1-2.) Further, Claimant reasserts that where the ALJ found Claimant disabled as of her 55th birthday, the remainder of her findings and conclusions prior to that date were rushed and without reason, especially with regard to the evaluation of opinion evidence. (Id. at 2-3.) In conclusion, Claimant argues that her case is akin to others where a diagnosis made after the relevant determination date but related to her pre-DLI condition.[4] (Id. at 3.)

**The Relevant Evidence of Record**[5]

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and discusses it below.

---

[4] See Millner v. Schweiker, 725 F.2d 243, 246 (4th Cir. 1984); Kelly v. Berryhill, 5:15-cv-00075, 2017 WL 1194716 at *7-8 (W.D.Va. March 30, 2017).

[5] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.

<u>Medical Records Prior to August 2014 Immune System Disorder Diagnosis:</u>

In 2010, Claimant saw her primary care physician four times where diagnoses included sinusitis, bronchitis, and asthma. (Tr. at 283-286.) Similarly, in 2011, Claimant saw her primary care physician seven times. (Tr. at 276-282.) Treatment notes documented diagnoses of upper respiratory infection, urinary tract infection, hematuria, acute sinusitis, and pharyngitis. (<u>Id</u>.) Pulmonary function testing in August 2011, which was performed as part of a preoperative clearance for a colonoscopy, was of poor quality but indicated chronic obstructive pulmonary disorder (COPD). (Tr. at 319-320.) The record does not document emergency room visits or pursuit of specialized treatment with any provider in 2010 or 2011.

Claimant saw her primary care physician more frequently in 2012 with many of her complaints resulted in assessments including sore throat, acute sinusitis, hematuria, low back pain, asthma, urinary tract infection, and influenza-like symptoms. (Tr. at 241, 243, 247, 249, 252, 254, 260, 262, 264, 268.)

In June 2012, Claimant saw Jennifer Riffe, a physician's assistant to pulmonologist Vishnu Patel, M.D., for complaints of worsening shortness of breath. (Tr. at 322.) On examination, Claimant had bilateral decreased air entry with scattered expiratory wheezing without any crackles. (<u>Id</u>.) Ms. Riffe assessed Claimant with asthma with exacerbation, dyspnea on exertion, and acute respiratory insufficiency likely due to an upper respiratory infection, and ordered a chest x-ray, which was normal. (Tr. at 322, 324.) Ms. Riffe noted, "until [Claimant] quits smoking completely it will be very difficult to treat [her] lung disease because of constant irritation of the airway." (Tr. at 323.) Claimant also sought treatment for diarrhea in June 2012. (Tr. at 255.) A stool sample tested positive for clostridium difficile and physicians started Claimant on Flagyl. (Tr. at 353.) She

completed Flagyl treatment and a follow up stool sample was negative for clostridium difficile. (Tr. at 348.) At a follow up appointment in August 2012, Claimant denied heartburn, indigestion, nausea, vomiting, and abdominal pain. (Id.)

Treatment notes from Claimant's primary care physician in 2013 documented assessments for polyarthralgias, diarrhea, bronchitis, vitamin D and B12 deficiencies, reactive airway disease, and cough. (Tr. at 268-275, 374-385.) She saw Randy Brodnik, D.O., a gynecologist, in June 2013 for an annual visit. (Tr. at 364.) On examination, Claimant had regular and unlabored breathing, normal inspection of the back, and no deformities, clubbing, cyanosis, or edema in the extremities. (Tr. at 366.) Claimant also sought chiropractic treatment between July and September 2013 for neck and low back pain. (Tr. at 392-401.)

On September 10, 2013, Claimant saw Stephen Nutter, M.D., for a consultative examination at the behest of the State agency. (Tr. at 413-424.) Claimant claimed disability due to migraine headaches and fibromyalgia. (Tr. at 413.) She also complained of asthma, abdominal pain, nausea, vomiting, and back pain. (Tr. at 414.) On examination, Claimant had normal gait and appeared stable in both the supine and sitting positions. (Tr. at 425.) Her lungs were clear to auscultation and percussion, breath sounds were symmetrical bilaterally, and she had no chest tenderness. (Tr. at 415.) She had some pain and tenderness throughout her joints, but normal muscle strength in the upper and lower extremities and no evidence of muscle atrophy. (Tr. at 416.) A pulmonary function test showed moderate restrictive pulmonary disease with improvement after administration of a bronchodilator. (Tr. at 418.) Dr. Nutter assessed Claimant with migraine headaches, degenerative arthritis, asthma, and chronic cervical and dorsolumbar strain. (Tr. at 417.)

Between January and July 2014, Claimant continued to seek largely routine and conservative treatment with her primary care physician; treatment notes from her primary care physician document multiple vitamin B12 injections (Tr. at 430, 432, 434, 438-439, 441.), and assessments for hematuria, upper respiratory infection, vitamin B12 deficiency, acute sinusitis, shingles, acute bronchitis, and reactive airway disease. (Tr. at 430, 437, 444, 447, 450, 452, 457, 460, 463.) A January 2014 chest x-ray showed atherosclerotic aorta and mild emphysema of the lungs, but no acute pulmonary abnormalities. (Tr. at 470.)

Medical Records Concerning Immune Disorder Diagnosis:

Claimant's immune system disorder was not formally diagnosed until August 2014 when laboratory testing revealed an IgG value of 570 mg/Dl, with a reference range of 700 to 1600, and an IgA value of 80, with an expected value of 91 to 414. (Tr. at 469, 479.) On September 8, 2014, Claimant saw Rowena Gonzales-Chambers, M.D., an oncologist, regarding her low IgG and IgA levels. (Tr. at 471-472.) Claimant reported to Dr. Gonzales-Chambers that in the past five years she had about four to five sinus and bronchial infections per year. (Tr. at 471.) She stated that she did not remember having many infections as a youth, but she required six to eight hospitalizations for bronchial asthma. (Id.) She added that she still has asthma and required hospitalization in 1990 and 1991. (Id.) Claimant also reported that she has frequently been on antibiotics and prednisone, but there was a deliberate attempt to wean her from it and, until recently, she had not had prednisone for two years. (Id.) Dr. Gonzales-Chambers ordered a chest CT, recommended further laboratory testing, and encouraged Claimant to research the most effective ways to quit smoking. (Tr. at 472.)

The chest CT revealed moderate emphysematous changes within the lungs, but no

consolidation, or pleural or pericardial effusion. (Tr. at 478.) Repeat laboratory testing showed low, but close to normal, IgG and IgA levels, and an IgG E subclass 2 and 3 deficiency. (Tr. at 476, 501.) At a repeat examination with Dr. Gonzales-Chambers on October 6, 2014, Dr. Gonzales-Chambers assessed Claimant with IgG subclass 2 and 3 deficiency, but noted that her respiratory complaints had not been severe enough to require critical care unit or intensive care unit treatment. (Tr. at 501.) Dr. Gonzales-Chambers stated that she could offer IV IgG supplements, but noted that this was not a permanent solution as it was very expensive and needed to be done on a monthly basis. (Id.) Dr. Gonzales-Chambers added that IgG supplements could be offered in the future if Claimant had severe respiratory complaints requiring critical care unit or intensive care unit treatment. (Id.) Dr. Gonzales-Chambers advised Claimant to see an allergist for dermatographia and an elevated IgG level, and she instructed Claimant to follow up in one year. (Id.)

Medical Records Since August 2014 Diagnosis:

In November 2014, Claimant saw Joel A Schor, M.D., a hematologist/oncologist, for a second opinion regarding her immunoglobulin deficiencies. (Tr. at 489-491.) Dr. Schor noted that Claimant did not have a history for increased frequency or severity of upper respiratory infections or other infections, although Claimant had occasional viral infections, "but no more than her husband has", and she had not had sinusitis or required hospitalization for pneumonia. (Tr. at 489.) Dr. Schor further noted that Claimant had no history of chronic ulcerations or sores; she denied diarrhea, nausea, and vomiting; and she continued to smoke cigarettes. (Id.) Claimant's physical examination was within normal limits, showing normal gait, 5/5 range of motion and strength in all extremities, and clear and quiet breath sounds bilaterally. (Tr. at 490.) Dr. Schor concluded that

although Claimant had some diminished immunoglobulin levels, these might not lead to any significant pathology. (Id.) Later that month, Claimant saw Donald Asbury, M.D., an allergist, who noted that she had allergic rhinitis with strong cat, tree, and dust mite sensitivity. (Tr. at 499.)

Treatment records from Claimant's primary care providers dated from September 2014 through June 2015 indicated that Claimant continued with her regular appointments, for largely routine and conservative treatment. (Tr. at 505-570.) Treatment notes during that period do not document significant pathology, although they show that she continued to receive vitamin B12 shots, and she was assessed with vitamin B12 deficiency, upper respiratory infection, and urinary tract infection. (Tr. at 506-533, 541-548, 555-570.)

State Agency Medical Consultants:

In September 2013, A. Rafael Gomez, M.D. reviewed all the available medical evidence at the initial level of review and determined that Plaintiff's spine disorders, osteoarthritis, and asthma were severe in combination, but non severe individually. (Tr. at 62.) Dr. Gomez concluded that Claimant retained the capacity to lift 20 pounds occasionally and 10 pounds frequently; sit, stand, and/or walk six hours in an eight-hour workday; occasionally perform postural maneuvers. (Tr. at 63-64.) Dr. Gomez also determined that Claimant had no manipulative, visual, or communicative limitations, but she should avoid concentrated exposure to temperature extremes, vibration, pulmonary irritants, and work hazards. (Tr. at 64-65.) In December 2013, Dr. Gomez's opinion was affirmed as written by Rogelio Lim, M.D. (Tr. at 74-77.) Dr. Lim also opined that Claimant was capable of performing her past relevant work as actually performed. (Tr. at 78.)

Treating Source Statements:

On October 20, 2014, Christi Hill-Hurt, Claimant's treating physician's assistant,

completed a "To Whom It May Concern" letter stating that Claimant had been diagnosed with IgG and IgE deficiency on August 4, 2014. (Tr. at 479.) Ms. Hill-Hurt stated that these deficiencies suppress Claimant's immune system to where she is unable to fight off even mild infections, which could lead to severe illness and even be fatal. (Id.) Ms. Hill-Hurt indicated that Claimant should avoid being around large groups of people at once and avoid being around anyone who is ill at all times. (Id.) Finally, Ms. Hill-Hurt opined that based on Claimant's current medical condition it is in her best interest not to work. (Id.)

On July 20, 2015, Joseph Morrello, D.O., and Mary Ann Lester, MSPAC, completed identical "To Whom It May Concern" letters indicating that Claimant was diagnosed with a suppressed immune system in August 2014. (Tr. at 573, 575.) Dr. Morrello and Ms. Lester indicated further that Claimant's suppressed immune system makes her susceptible to many types of infections and makes it more difficult for her to recover. (Id.) Ms. Lester's letter has a handwritten addition that states "sometimes taking 2-4 weeks to recover per infection" (Tr. at 573.) and Dr. Morrello's letter corroborates that opinion insofar as he opined that Claimant's infections "sometimes taking two to four weeks to recover from infection." (Tr. at 575.) As such, Dr. Morrello and Ms. Lester both recommended that Claimant avoid large groups of people to decrease her chance of contracting infections and viruses. (Tr. at 573, 575.)

**The Administrative Hearing**

Claimant Testimony:

Claimant had substantial gainful activity only in 2006 during the past relevant period. (Tr. at 39.) Claimant stated that she could no longer work because she was frequently sick from infections in her lungs, from skin welts or hives, and that she could not keep other jobs or was let

go because of taking too many sick days. (Tr. at 41.) She explained that IgG affected her lungs for which she takes long-term antibiotics and Prednisone. (Tr. at 52.) She also explained that IgA affected her sinuses and lymph nodes and IgE affected her skin, causing her welts and hives. (Id.) Claimant explained that unlike a normal person's immune system that repairs itself every 28 to 30 days, hers remains the same. (Tr. at 53.)

Claimant testified that she was diagnosed with this immune disorder just the year before, but the IV therapy treatment offered to her cost too much, which consisted of having to go to a hospital for a port to be put in with an IV for 10 to 12 hours a day. (Tr. at 42.) Further, Claimant was told by her doctor that this treatment provided no guarantees, and as soon as the IV was removed, her immune system would go back to the way it was. (Tr. at 42, 52-53.) Claimant testified that she had been affected by this impairment her entire life; she recalled missing school because she was sick and it took her a long time to recover. (Tr. at 43.) Claimant testified that when she was working and got sick, she would miss a month of work, and this would occur every other month. (Tr. at 44.)

Claimant stated that she had taken Prednisone her whole life, and although it caused her bones to deteriorate, she continues to take it because she has to due to her illness. (Id.) She testified that she takes Prednisone probably four to six months out of a year. (Tr. at 45.) Claimant testified that Dr. Patel diagnosed her with C-DIFF on June 26, 2012, which is the cause of her being sick for several months necessitating Prednisone and breathing treatments. (Tr. at 46.) Because taking long-term antibiotics killed the natural flora balance in her stomach, she contracted a highly contagious infection that had to be treated with four courses of treatment that most people only require one. (Id.)

Claimant testified that she waited to apply for disability because she did not know she had a suppressed immune system, and she did not want to continue to disappoint herself or employers not being able to keep a job being sick and missing work. (Tr. at 47.) She also did not know that she could even apply for disability when a friend told her to try and "just see". (Id.)

Claimant reported that she and her husband are the primary caregivers for their 8 ½ year old granddaughter, who they has adopted in 2010 at approximately the same time she stopped working. (Tr. at 48-49.) Claimant testified that she can attend to her personal hygiene, but her husband mostly does the cooking, cleaning and the grocery shopping. (Id.) Claimant also drives, but she does not go out very often. (Tr. at 50.) She does not go out during flu season, but when she does go out, she avoids large crowds and wears gloves and a mask. (Tr. at 51.)

John Newman, Vocational Expert ("VE") Testimony:

The VE classified Claimant's past job that was at substantial gainful activity level in 2006 as a receptionist, skilled and sedentary. (Tr. at 53.) The ALJ provided a hypothetical where an individual with Claimant's vocational profile (age, education, and work experience) with the restrictions contained in the RFC, described *supra*. (Tr. at 53-54.) The VE testified that such a person probably could not perform the receptionist job due to exposure to the general public, however, other unskilled and sedentary jobs that would not involve exposure to either large groups of people or the general public would include item assembler, packer, and stuffer. (Tr. at 54-55.) As far as light unskilled work is concerned, the VE testified that such an individual could perform the jobs of an assembler, packer, or laundry folder. (Tr. at 55.) The VE stated that if the individual would miss two to three weeks due to illness, then the individual would not be able to meet the demands of competitive employment. (Id.) Additionally, the VE testified that if the individual

missed one day per month, then the individual can maintain employment, but any more than that, could not. (Id.)

**<u>Scope of Review</u>**

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In <u>Blalock v. Richardson</u>, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

<u>Blalock v. Richardson</u>, 483 F.2d 773, 776 (4th Cir. 1972) (quoting <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence, however, the Court determines if the final decision of the Commissioner is based upon an appropriate application of the law. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." <u>Blalock</u>, 483 F.2d at 775.

**<u>Analysis</u>**

As previously stated, Claimant argues the ALJ failed to abide by the Regulations when evaluating the opinion evidence. (Document No. 20 at 6-10.)

<u>The Evaluation of Opinion Evidence:</u>

The Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. § 404.1527(c)(2). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. § 404.1527(c)(2). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits. 20 C.F.R. § 404.1527(c)(2). Ultimately, it is the responsibility of the Commissioner, not the court, to review the case, make findings of fact, and to resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1994).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. § 404.1527(c)(2)-(6). These factors include: (1) Length of the treatment relationship and frequency of evaluation, (2) Nature and extent of the treatment relationship, (3) Supportability, (4) Consistency, (5) Specialization, and (6) various other factors. Additionally, the Regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. § 404.1527(c)(2). Under § 404.1527(d)(1), more weight is given to an examiner than to a non-examiner.

The undersigned addresses the opinion evidence in the order they are discussed in the decision. The ALJ first noted the opinions of the State agency consultants and gave them "significant weight", noting that they both found Claimant capable of lifting/carrying 20 pounds occasionally and 10 pounds frequently, standing/walking/sitting 6 hours in an 8-hour workday with various postural limitations, including avoidance of "concentrated exposure to extreme cold, extreme heat, vibration, fumes, odors, dust, gases, poorly ventilated areas, etc., and hazards." (Tr. at 22.) The ALJ acknowledged that neither Dr. Gomez nor Dr. Lim examined or treated Claimant, though both possessed a "high level of understanding of the Social Security disability program and had the opportunity to review all available medical records when forming their opinions." (Id.) Still, other evidence received subsequent to when they rendered their opinions necessitated greater limitation. (Id.)

In accordance with the aforementioned Regulations, the ALJ acknowledged that several opinions in the record were provided by Claimant's treating providers: Jennifer Riffe, P.A.-C.; Vishnu Patel, M.D.; Christie Hill-Hurt, M.S.P.A.-C.; Mary Ann Lester, M.S.P.A.-C.; and Joseph Morrello, D.O. (Tr. at 22-23.) The ALJ noted Ms. Riffe and Dr. Patel opined in September 2009 and December 2009 that Claimant should avoid extreme temperatures, chemicals, sprays, smoking, painting, and strong odors. (Tr. at 22, 315, 317-318.) The ALJ acknowledged that Dr. Patel was an acceptable medical source[6], however, the ALJ gave both opinions "some weight", noting they were provided prior to the alleged onset date, although the record supported the limitations the two treating sources found during the relevant period. (Tr. at 22.)

The opinion provided by Christie Hill-Hurt, M.S.P.A.-C. was afforded "limited weight",

[6] See 20 C.F.R. § 404.1513(a)

and the ALJ noted that she is not an acceptable medical source, however, the ALJ found her opinion that Claimant should avoid being around large groups of people consistent with the medical record. (Id.) The ALJ further noted that Ms. Hill-Hurt's opinion that Claimant was unable to work "an unsupported leap in logic, as she appears to assume that no jobs exist which do not involve being around large groups of people at once – an assumption out of the range of her expertise." (Tr. at 22-23.) Further, the ALJ found Ms. Hill-Hurt did not provide a function by function assessment. (Tr. at 23.)

With regard to Mary Ann Lester's and Dr. Joseph Morrello's opinions, the ALJ gave them "some weight", noting their opinions that Claimant "should avoid exposure to large groups of people is consistent with the medical evidence, as her immune disorders increase her chances of contracting illnesses from others." (Tr. at 23, 573, 575.) The ALJ also noted that Ms. Lester's letter had the handwritten addition, described *supra*, further noting that it had not been initialed and that the parameters of such recovery were unclear. (Tr. at 23, 573.) Interestingly, the ALJ does not acknowledge that Dr. Morrello's letter contained virtually the same opinion that Claimant would sometimes take two to four weeks to recover from an infection.

Claimant takes issue with the "significant weight" afforded to the opinions of the State agency consultants, who found "no severe impairments" (Document No. 20 at 7.), however, contrary to Claimant's argument otherwise, these medical experts actually found Claimant had no severe impairments individually, but ***were*** severe in combination. (Tr. at 62, 74.) Nevertheless, both opinions contained environmental restrictions consistent with the opinions of Claimant's treating sources, Ms. Riffe and Dr. Patel. (Tr. at 65, 77, 315, 317-318.) Given these consistencies with treating source opinions, with the addition of their knowledge of the Social Security disability

program and having had the opportunity to review all the medical record available to them at the time, the undersigned **FINDS** the ALJ's evaluation of the State agency medical consultants' opinions is supported by substantial evidence. With regard to the opinions of Ms. Riffe and Dr. Patel, no other restrictions or functional limitations were provided; indeed, their opinions predated the alleged onset date. With that in mind, the undersigned **FINDS** that the ALJ's evaluation of the opinions provided by Ms. Riffe and Dr. Patel is supported by substantial evidence.

With respect to Ms. Hill-Hurt, there is no dispute that she is not an acceptable medical source, therefore, the ALJ had no duty to consider her opinion pursuant to 20 C.F.R. § 404.1513(d). Further, the ALJ also had no duty to give any special significance to Ms. Hill-Hurt's opinion that Claimant's impairments precluded work, as such determinations are reserved to the Commissioner. See Id. § 404.1527(d)(3). Nevertheless, the ALJ found her opinion that Claimant "should avoid being around large groups of people is consistent with the medical record" (Tr. at 22.), accordingly, the undersigned **FINDS** that the "limited weight" afforded to Ms. Hill-Hurt's opinion is supported by substantial evidence.

Like Ms. Riffe and Ms. Hill-Hurt, the ALJ similarly found Ms. Lester was not an acceptable medical source, and appeared to question the authenticity of the handwritten addition to her opinion regarding the two to four week recovery time from infection. (Tr. at 23.) However, given the aforementioned Regulations treatment of "other source" opinion evidence, the ALJ did not have to consider Ms. Lester's opinion, but finding it consistent with the record insofar as Claimant should avoid large groups of people, the undersigned **FINDS** the ALJ's affording it "some weight" is supported by substantial evidence.

With respect to Dr. Morrello, however, there is no dispute that he is not only a treating

source, but also an acceptable medical source. The ALJ also found that his opinion was consistent with the medical evidence that Claimant should avoid large groups of people "as her immune disorders increase her chances of contracting illnesses from others." (Id.) Dr. Morrello also provided an opinion that Claimant "sometimes" had a protracted recovery time from infections that the ALJ did not acknowledge. Indeed, this two to four week recovery time is at least consistent with not only Ms. Lester's opinion, but also with Claimant's testimony. There is no additional opinion, or other evidence that addresses this prolonged recovery issue. Though the evidence of record did not indicate Claimant's infections and/or prolonged recoveries required emergency care or CCU/ICU treatment, Dr. Morrello's unacknowledged opinion regarding Claimant's prolonged recovery time from infection is a glaring omission of the evidence considered by the ALJ.

The undersigned is cognizant of the fact that Claimant's records from Drs. Gonzales-Chambers and Schor post-date the disability determination date, and notably, the ALJ found both doctors were specialists, and neither "support the claimant's allegations regarding the severity of her immune disorders." (Tr. at 22, 471-478, 489-496, 498-502.) However, this is inconsistent with Dr. Morrello's opinion, who had been treating Claimant long before and long after the established onset date of disability. (Tr. at 374-391, 429-470, 504-538, 541-552.) Of further interest is that both Drs. Gonzales-Chambers and Schor were consultants, referred by Dr. Jana Peters's office, where Dr. Morrello practiced and had treated Claimant for several years; this distinction is important pursuant to the aforementioned Regulations in evaluating opinion evidence.

In short, the ALJ gave Dr. Morrello's opinion just "some weight", the same weight afforded to the opinion of Ms. Lester, who is indisputably not an "acceptable medical source". Other than acknowledging that Dr. Morrello was a treating source and that his opinion was consistent insofar

as Claimant should avoid large groups of people due to her immune disorder, the ALJ provided no additional "good reasons" why she did not afford his opinion controlling or greater weight pursuant to the Regulations. 20 C.F.R. § 404.1527(c)(2); <u>Cook v. Heckler</u>, 783 F.2d 1168 (4th Cir. 1986); <u>Hammond v. Heckler</u>, 765 F.2d 424 (4th Cir. 1985). Dr. Morrello provided an opinion regarding Claimant's functional limitation, that Claimant sometimes had a prolonged recovery period from infection, which was simply unacknowledged, despite its consistency with other evidence of record.

In addition, the undersigned agrees with Claimant to the extent that a proper evaluation of Dr. Morrello's opinion is important with regard to his status as a treating physician belonging to a medical practice that the record indicates had been Claimant's primary care providers for over eight years. Dr. Morrello's opinion is important in this case because Claimant's immune disorder diagnosis was rendered *during* his treatment of her, and therefore, this opinion evidence has a greater likelihood of relating back to Claimant's illnesses, symptoms, and impairments not only prior to her DLI, but also before the established onset date of disability. <u>See</u> <u>Millner v. Schweiker</u>, 725 F.2d 243, 246 (4th Cir. 1984); <u>Kelly v. Berryhill</u>, 5:15-cv-00075, 2017 WL 1194716 at *7-8 (W.D.Va. March 30, 2017). Because the ALJ failed to acknowledge Dr. Morrello's opinion in its entirety, and improperly evaluated same, the potential impact of his opinion on the ALJ's established onset date of disability cannot be ignored. Accordingly, the undersigned **FINDS** the ALJ's evaluation of Dr. Morrello's opinion is not supported by substantial evidence.

The RFC Assessment:

Residual functional capacity represents the *most* that an individual can do despite his limitations or restrictions. <u>See</u> Social Security Ruling 96-8p, 1996 WL 3744184, at *1 (emphasis

in original). The Regulations provide that an ALJ must consider all relevant evidence as well as consider a claimant's ability to meet the physical, mental, sensory and other demands of any job; this assessment is used for the basis for determining the particular types of work a claimant may be able to do despite his impairments. 20 C.F.R. § 404.1545(a). The RFC determination is an issue reserved to the Commissioner. See Id. § 404.1527(d).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physician's opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

Following the discussion of the medical evidence regarding Claimant's impairments, her allegations and testimony of same, and the evaluation of the opinion evidence, the ALJ summarized the RFC assessment as described *supra*. An ALJ is required to "build an accurate and logical bridge from the evidence to his conclusion." Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016) (quoting Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000)). However, since Dr. Morrello's opinion was given less than controlling weight, coupled with the fact that his opinion regarding Claimant's prolonged recovery time from infections was wholly unacknowledged without further explanation, the RFC assessment prior to November 28, 2013, the established onset date of disability, cannot stand. Hypothetical questions need only incorporate those limitations that an ALJ accepts as credible and that are supported by the record. See Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989). Although the ALJ asked the vocational expert questions regarding excessive absenteeism due to illnesses, the decision did not address this. In short, meaningful review is foreclosed in this case because the ALJ did not explain why she found Claimant's alleged

excessive absenteeism due to illness less than credible, particularly when it was supported by her treating physician's opinion evidence. Accordingly, the undersigned **FINDS** that the ALJ's RFC assessment prior to the established onset date of disability of November 28, 2013 is not supported by substantial evidence.

<u>Evaluating Credibility and Pain:</u>

Social Security Ruling 96-7p[7] clarifies the evaluation of symptoms, including pain: 20 C.F.R. §§ 404.1529, 416.929 requires a finding about the credibility of an individual's statements about pain or other symptom(s) and its functional effects; explains the factors to be considered in assessing the credibility of the individual's statements about symptoms; and states the importance of explaining the reasons for the finding about the credibility of the individual's statements. <u>See, also</u>, <u>Hammond v. Heckler</u>, 765 F.2d 424, 426 (4th Cir. 1985).

The Ruling further directs that factors in evaluating the credibility of an individual's statements about pain or other symptoms and about the effect the symptoms have on his or her ability to function must be based on a consideration of all of the evidence in the case record. This includes, but is not limited to: (1) the medical signs and laboratory findings; (2) diagnosis, prognosis, and other medical opinions provided by treating or examining physicians or psychologists and other medical sources; and (3) statements and reports from the individual and from treating or examining physicians or psychologists and other persons about the individual's medical history, treatment and response, prior work record and efforts to work, daily activities,

---

[7] The undersigned is aware that this Ruling has been superseded by SSR 16-3p, effective March 28, 2016, however, the former Ruling applies to the ALJ's decision herein, having been issued on October 15, 2015. <u>See</u>, SSR 16-3p, 2016 WL 1131509.

and other information concerning the individual's symptoms and how the symptoms affect the individual's ability to work.

As an initial matter, it is well known that credibility determinations are properly within the province of the adjudicator and beyond the scope of judicial review. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990); <u>Davis v. Colvin</u>, 3:13-CV-23399, 2015 WL 5686896, at *7 (S.D.W. Va. Sept. 8, 2015) ("The credibility determinations of an administrative judge are virtually unreviewable on appeal.") Claimant only asserts that the ALJ did not believe him. (Document No. 25 at 3.)

The ALJ herein properly performed the two-step process,[8] and then proceeded to review the evidence of record and reconciled it with Claimant's statements concerning the intensity, persistence and limiting effects of his symptoms. (Tr. at 21.) This evidence included, but was not limited to Claimant's allegations in her application for benefits, in which she alleged being disabled due to asthma, migraines and fibromyalgia, and later, due to hip and leg pain. (Tr. at 18.) The ALJ also discussed Claimant's testimony during the hearing, which included testimony concerning her more recent diagnoses of IgG, IgA, and IgE. (<u>Id</u>.) The ALJ next reviewed at length the medical evidence of record, discussed *supra*, with multiple citations from the record. (Tr. at 18-23.) After her review of the evidence, the ALJ expressly found that Claimant's statements concerning the limitations caused by her symptoms not entirely credible based on: "the record documents mainly conservative primary care treatment"; "[m]any of the temporary ailments documented in the record were accompanied by breathing symptoms, yet she continued to smoke despite the admonition of multiple providers"; the treatment records did not corroborate her

---

[8] <u>See</u>, <u>Craig v. Chater</u>, 76 F.3d 585, 594 (4th Cir. 1996).

complaints of pain and physical examinations "have been largely normal"; there was no evidence of emergency room visits or more intensive care treatment; two specialists did not support Claimant's allegations of the severity of her immune disorders; and finally (and the most contested), the ALJ stated, "[t]he claimant's own testimony indicates that she did not file for disability until about three years after her alleged onset date because she did not believe that she qualified as disabled." (Tr. at 21-22.)

The ALJ's discussion of Claimant's subjective complaints in addition to the objective medical evidence and the findings therein, is illustrative that the ALJ reviewed the factors promulgated under 20 C.F.R. §§ 404.1529(c) to assess Claimant's credibility, and is compliant with the Regulations. Claimant's contention that the ALJ "misconstrued" her testimony is without merit, as the written decision demonstrates that the ALJ considered the evidence[9] and reconciled it with Claimant's allegations pursuant to the proper legal authorities. In short, the undersigned **FINDS** the ALJ's credibility analysis was adequate under the Regulations and based upon substantial evidence.

### Recommendations for Disposition

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **GRANT** the Claimant's request to reverse the Commissioner's final decision to the extent that substantial evidence does not support the finding that she was not disabled prior to November 28, 2013 (Document No. 20.), **DENY** the Defendant's request to affirm (Document No. 23.), **REVERSE** the final decision of the Commissioner, and **REMAND** this matter back to the

---

[9] With the exception of Dr. Morrello's opinion evidence as discussed *supra*.

Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further administrative proceedings to allow the adjudicator to make a proper evaluation of Dr. Morrello's opinion, in its entirety; and further, to assess that opinion with respect to Claimant's alleged onset date of February 18, 2010 through to November 27, 2013, the date prior to the established onset date of disability.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable David A. Faber, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Faber, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: August 28, 2017.

Omar J. Aboulhosn
United States Magistrate Judge